# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### (San Angelo Division)

_____ )
                                      )
EXOTIC WILDLIFE ASSOCIATION, CHASE )
AKIN, GALEN AKIN, KARLTON BEAL,    )
EDDY BLASSINGAME, RANDY BRUNO,    )
TERRY CAFFEY, LYNN FOLLIS, RONALD )
GARISON, JOE GREEN, NANCY GREEN,    )
RANDAL JACOBY, DOROTHY LEA, ROY   )
LEIFESTER, STANLEY MAYFIELD, ALVIN )
NEW, TERRY OWEN, ED VALICEK,       )
KEITH WALLACE,                          )
                                      )
               Plaintiffs,             )      No. 6:11-cv-00082-C
                                        )
               v.                     )      Hon. Sam R. Cummings
                                        )
UNITED STATES DEPARTMENT OF      )
THE INTERIOR;                        )
KEN SALAZAR, in his official capacity     )
 as Secretary of the Department of the Interior; )
UNITED STATES FISH AND          )
WILDLIFE SERVICE;                )
DANIEL M. ASHE, in his official       )
capacity as Director of the United States    )
Fish and Wildlife Service,           )
                                       )
               Defendants.        )
_____ )

# MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

# Table of Contents

Table of Contents ............................................................................................ ii

Table of Authorities ........................................................................................ iv

Factual and Procedural Background ................................................................2

    Listing Decision ........................................................................................4

Argument ........................................................................................................7

    I.  Plaintiffs provided sufficient notice under the Endangered Species Act ...................7

        A.  Legal Standards for Notice ........................................................8

        B.  Exotic Wildlife Provided Clear Notice...........................................11

        C.  The Government's Cases are Inapplicable ....................................13

        D.  Exotic Wildlife Properly Brought Both ESA and APA Claims ....................14

    II.  The Case Should Remain in the Northern District of Texas .....................16

        A.  Venue is Appropriate in this Court..............................................16

        B.  The Government Has Failed to Sustain Its Burden to Establish that this Case Should be Transferred ...................................17

            1.  Standard for Motions to Transfer ....................................17

        C.  Private Interest Considerations Require Adjudication in the Northern District of Texas ........................................................18

            1.  Relative Ease of Access to Sources of Proof ................................18

            2.  Availability of Compulsory Process to Secure Witnesses' Attendance ...................................................19

            3.  Willing Witnesses' Cost of Attendance .........................................19

            4.  All Other Problems that Make Case's Trial Easy, Expeditious, and Inexpensive ...................................................19

        D.  Public Concerns...........................................................20

            1.  Administrative Difficulties Flowing From Court Congestion ...................................................20

2.  Local Interest in Having Local Issues Decided at Home ...............20

3.  Forum's Familiarity with the Governing Law ...............................21

4.  Avoidance of Unnecessary Conflict of Law Problems .................22

E.  The Government's "Judicial Economy" Argument Does Not Support Transfer.......................................................................................................22

Conclusion .................................................................................................................24

## Table of Authorities

**CASES**

Abbot Laboratories v. Gardner, 387 U.S. 136 (1967)....................................................15

Acumen Enters. v. Morgan, 2011 U.S. Dist. LEXIS 132044
(N.D. Tex. Nov. 15, 2011) ...........................................................................................18

Bennet v. Spear, 520 U.S. 154 (1997)............................................................................15

Biochem Pharma, Inc. v. Emory Univ., 148 F. Supp. 2d 11 (D.D.C.  2001)...............23

Biodiversity Legal Foundation v. Norton, 284 F.3d 1046 (9th Cir. 2002)....................15

Brod v. Omya, Inc., 653 F.3d 156 (2d Cir. 2011) .....................................................8, 11

Cadle Co. v. Whataburger of Alice, Inc., 174 F.3d 599 (5th Cir. 1999).......................24

Carlile v. Continental Airlines, Inc., 953 F. Supp. 169 (S.D. Tex. 1997) ....................18

Ctr. for Biological Diversity & Pac. Env't. v. Kempthorne,
2007 U.S. Dist LEXIS 53187 (N.D. Cal 2007)............................................................21

Envtl. Prot. Info. Ctr. v. Simpson Timber Co., 255 F.3d 1073 (9th Cir. 2001) ............16

Forest Guardians v. Babbitt, 174 F.3d 1178 (10th Cir. 1999)................................15, 16

Friends of Animals v. Salazar, 626 F. Supp. 2d 102 (D.D.C. 2009)...............................5

Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 629 F.3d 387
(4th Cir. 2011)................................................................................................................8

Hallstrom v. Tillamook Cty., 493 U.S. 20 (1989).....................................................8, 13

Hawksbill Sea Turtle v. FEMA, 939 F. Supp. 1 (D.D.C. 1996) ...................................21

Lockett v. EPA, 319 F.3d 678 (5th Cir. 2003)................................................................7

Lone Rock Timber Co. U.S. Dep't of Interior, 842 F. Supp. 433 (D. Or. 1994) ..........14

Mohamed v. Mazda Motor Corp., 90 F. Supp. 2d 757 (E.D. Tex. 2000) .....................18

National Wildlife Federation v. Harvey, 437 F. Supp. 2d 42 (D.D.C. 2006) ...............21

Peteet v. Dow Chem. Co., 868 F.2d 1428 (5th Cir. 1989) ............................................17

Pub. Interest Research Grp. of N.J., Inc. v. Hercules, Inc., 50 F.3d at 1248
(3rd Cir. 1995)...........................................................................................................8, 11

Safari Club International v. Salazar, et al., No. 1:11-cv-01564-BAH
(D.D.C Filed Aug. 31, 2011)........................................................................................23

Save Power Ltd. V. Syntek Finance Corp., 121 F.3d 947 (5th Cir. 1997)....................................24

Sierra Club v. Glickman, 156 F.3d 606 (5th Cir. 1998)........................................................15

Sierra Club v. Yeutter, 926 F.2d 429 (5th Cir. 1991) ......................................................7, 14

Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation, 143 F.3d 515
    (9th Cir. 1998)..................................................................................14

Stewart Org. Inc. v. Ricoh Corp., 487 U.S. 22 (1988) ....................................................17

Time, Inc. v. Manning, 366 F.2d 690 (5th Cir. 1966)......................................................18

Town of Ledyard v. United States, 1995 U.S. Dist. LEXIS 21477 ....................................22

Trout Unlimited v. United States Dept. of Agriculture, 944 F. Supp. 13
    (D.D.C. 1996)..............................................................................21, 22

United States v. Idaho, 508 U.S. 1 (1993) ......................................................................8

In re Volkswagen AG, 371 F.3d 201 (5th Cir. 2004)......................................................16

In re: Volkswagen, 545 F.3d 304 (5th Cir. 2008) ..........................................................17

In re Voluntary Purchasing Grps., Inc. Litigation, 2002 U.S. Dist. LEXIS 19819
    (N.D. Tex. Oct. 16, 2002) ............................................................8, 9, 10

Washington Trout v. McCain Foods, Inc., 45 F.3d 1351(9th Cir. 1995)..................................8, 11

Water Keeper Alliance v. U.S. Dept. of Defense, 271 F.3d 21 (1st Cir. 2001) ......................8, 10

The Wilderness Society v. Babbitt, 104 F. Supp. 2d 10 (D.D.C 2000) ........................................22

## STATUTES

16 U.S.C. § 1540(g)(1)..............................................................................................2, 7

16 U.S.C. § 1540(g)(2)..................................................................................................7

16 U.S.C. § 1532(19) ....................................................................................................5

16 U.S.C. § 1533(b)(3)............................................................................................6, 7, 12

28 U.S.C. § 1391(e)(1)................................................................................................16

28 U.S.C. § 1391(e)(2)................................................................................................16

28 U.S.C. § 1404(a) ...........................................................................................2, 17, 24

**REGULATIONS**

40 C.F.R. § 135.3(a) ..........................................................................................................8, 9

40 C.F.R. § 254.3(a) ..........................................................................................................8, 9

50 C.F.R. § 11.11(a) ...........................................................................................................8

70 Fed. Reg. at 52,317 (Set. 2, 2005) .................................................................................4

70 Fed. Reg. 52,319 (Sept. 2, 3005) ...................................................................................3

76 Fed. Reg. 39,801 (July 7, 2011) .....................................................................................5

77 Fed. Reg. 431 (Jan. 5, 2012) ..........................................................................................5

**MISCELLANEOUS**

Federal Court Management Statistics .................................................................................20

IUCN Red List of Threatened Species 2010.1 (2010) .......................................................3

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### (San Angelo Division)

_____ )
                                         )
EXOTIC WILDLIFE ASSOCIATION, CHASE )
AKIN, GALEN AKIN, KARLTON BEAL,     )
EDDY BLASSINGAME, RANDY BRUNO,    )
TERRY CAFFEY, LYNN FOLLIS, RONALD )
GARISON, JOE GREEN, NANCY GREEN,    )
RANDAL JACOBY, DOROTHY LEA, ROY    )
LEIFESTER, STANLEY MAYFIELD, ALVIN )
NEW, TERRY OWEN, ED VALICEK,       )
KEITH WALLACE,                            )
                                         )
           Plaintiffs,             )    No. 6:11-cv-00082-C
                                         )
            v.                    )    Hon. Sam R. Cummings
                                         )
UNITED STATES DEPARTMENT OF      )
THE INTERIOR;                          )
KEN SALAZAR, in his official capacity    )
 as Secretary of the Department of the Interior; )
UNITED STATES FISH AND           )
WILDLIFE SERVICE;                 )
DANIEL M. ASHE, in his official      )
capacity as Director of the United States    )
Fish and Wildlife Service,          )
                                         )
           Defendants.           )
_____ _____ )

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

Plaintiffs, Exotic Wildlife Association, Chase Akin, Galen Akin, Karlton Beal, Eddy Blassingame, Randy Bruno, Terry Caffey, Lynn Follis, Ronald Garison, Joe Green, Nancy Green, Randal Jacoby, Dorothy Lea, Roy Leifester, Stanley Mayfield, Alvin New, Terry Owen, Ed Valicek, and Keith Wallace (hereinafter "Exotic Wildlife"), oppose the Government's motion to dismiss, or alternatively, to transfer this case to the District of Columbia.  The Government has not met its burden and shown that notice was inadequate, or made a substantial showing that transfer is necessary for convenience or fairness as required by 28 U.S.C. §1404(a).

Exotic Wildlife provided clear notice to the Government describing the violation, and the intended lawsuit if the violations were not corrected, satisfying notice requirements under the Endangered Species Act.[1]  Additionally, both the private and public interest factors weigh heavily against transfer: as the Plaintiffs reside in this district, the majority of the witnesses and relevant species experts reside in this district, the case would be heard more quickly if it were to remain in this Court, the species at issue live and breed in this district, and the regulations at issue would have the most substantial impacts within this district.  This is a local issue that should be decided at home.

For these reasons, discussed more fully in the sections below, the Government's motion to dismiss, or alternatively to transfer, should be denied.

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs are ranchers in Texas.  They are also members of the Exotic Wildlife Association and have taken on the mission of raising some unusual herds–endangered African antelope.  The scimitar-horned oryx (*oryx dammah*), the dama gazelle (*gazelle dama*), and the

---

[1] *See* 16 U.S.C. § 1540(g)(1)(C).

addax (*addax nasamaculatus*) are native to northern Africa, but all three are extinct or near extinction in their home ranges.[2]

The scimitar-horned oryx was historically found in the wild in Algeria, Burkina Faso, Chad, Egypt, Libyan Arab Jamahiriya, Mali, Mauritania, Morocco, Niger, Nigeria, Senegal, Sudan, Tunisia, and Western Sahara.  There were an estimated 500 scimitar-horned oryx in Chad and Niger until about 1985, but by 1988, only a few dozen individuals survived in the wild.  Since then, there have been no confirmed sightings in the wild.[3]

The addax was historically found in the wild in the desert or semi-desert habitats of the Sahara and Sahel regions of North Africa, as well as in Chad, Mauritania, Niger, Algeria, Egypt, Libyan Arab Jamahiriya, Sudan, and Western Sahara.[4]  There were reports of "immense herds" of addax north of Lake Chad in the 1920s.  But after World War II, these populations dramatically declined.  Unlike the scimitar-horned oryx, some addax can still be found in the wild, but the International Union for Conservation of Nature estimates that only about 300 wild addax exist today.[5]

The dama gazelle was historically found in the wild in Chad, Mali, Niger, Libyan Arab Jamahiriya, Mauritania, Morocco, Nigeria, Algeria, Tunisia, Senegal, Sudan, and Western Sahara.[6]  Some remain in Mali, Chad, and Niger, but they are believed to have completely disappeared from North Africa.[7]

---

[2] 70 Fed. Reg. 52, 319 (September 2, 2005).
[3] IUCN SSC Antelope Specialist Group 2008, *Oryx dammah*, IUCN Red List of Threatened Species 2010.1 (2010), http://www.iucnredlist.org/apps/redlist/details/15568/0 [hereinafter "IUCN Red List"].
[4] IUCN Red List, *Addax nasomaculatus*, http://www.iucnredlist.org/apps/redlist/details/512/0 (citation omitted).
[5] *Id.*
[6] IUCN Red List, *Nanger dama*, http://www.iucnredlist.org/apps/redlist/details/8968/0.
[7] *Id.*

Today, the largest herds of these three species are found here in Texas, on Exotic Wildlife's ranches.  Through a program of scientific breeding and best conservation practices, Plaintiffs have, over the decades, increased the United States populations of these animals to the point that they are no longer in danger of extinction in this country.  Plaintiffs have even shipped animals back to Africa for reintroduction into their native habitats, and are prepared to provide more animals for reintroduction as soon as it is safe and prudent to do so.

In 2010, Exotic Wildlife conducted a survey of its members to update the data for the captive-bred populations of the three antelope species.  That survey showed that Exotic Wildlife members alone have over 11,000 scimitar-horned oryx, almost 900 dama gazelles, and over 5,000 addax on their ranches here in Texas.  Other studies confirm that the size of these populations has been increasing for the past 40-plus years.[8]

**Listing Decision**

On September 2, 2005, following nearly twelve years of protracted negotiations, the United States Fish and Wildlife Service ("FWS") issued a final rule adding the three African antelope species to the Endangered Species List – the scimitar-horned oryx, the dama gazelle, and the addax.  Taking into account the information gained in the extensive discussions leading up to the listing decision, FWS included in the final rule a blanket exemption for captive bred populations of the three antelope species that, provided ranchers complied with stringent FWS requirements, allowed the take, trade, transportation, and sale of the domestic population of the three antelope species.[9]

---

[8] Administrative Record (A.R.) 70-71 (citations to A.R. are to the Third Supplemental Administrative record regarding the Exclusion of U.S. Captive-Bred Scimitar-horned Oryx, Addax, and Dama Gazelle from Certain Prohibitions, Final Rule Civil Case Nos. 04-1660 and 06-2120 (Consolidated Cases) as ratified by FWS Records Officer on September 4, 2008).
[9] 70 Fed. Reg. at 52,317 (Sept. 2, 2005).

Four years after the blanket exemption was promulgated, two environmental groups challenged this exemption.  On June 22, 2009, Judge Kennedy of the United States District Court for the District of Columbia ruled the exemption to be in violation of the Endangered Species Act's ("ESA")'s permit notice and comment requirements.[10]   Judge Kennedy vacated and remanded the rule to FWS, directing FWS to issue new regulations.[11]

On July 7, 2011, in compliance with Judge Kennedy's order, FWS issued a notice of proposed rulemaking to remove the exemption that allowed Exotic Wildlife to raise herds of the three antelope species on their ranches.[12]  And, on January 5, 2012, the FWS adopted a final rule removing the exemption and requiring Plaintiffs to obtain permits or to "divest themselves of these species" before the rule goes into effect on April 4, 2012.[13]

Without the exemption, the take prohibitions and permit requirements of the ESA apply to the domestic populations of these three antelope species located on Texas ranches just as they would apply to wild populations of animals.  Specifically, the ESA prohibits the "take" of any endangered species, which Congress has defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."[14]

In short, without the ESA exemption, the traditional ranching activities of breeding, herding, feeding, vaccinating, providing medical care, and culling all may constitute a prohibited "take" of an endangered species.  Exotic Wildlife members thus would have little incentive to continue conserving and increasing the populations of these three species—activities that may soon become unlawful.  Populations of the three species are now seen as great potential liabilities, and already Exotic Wildlife's members have begun to avoid breeding new antelope

---

[10] *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102 (D.D.C. 2009).
[11] *Id.* at 120.
[12] 76 Fed. Reg. 39,801 (July 7, 2011)
[13] 77 Fed. Reg. 431 (Jan. 5, 2012).
[14] 16 U.S.C. § 1532(19).

and are selling off existing stock that are difficult and expensive to care for.  Perversely, the inevitable result is a decrease in the populations of these animals.  So, because of the restrictions placed on Exotic Wildlife's members, the result will be precisely what the ESA was enacted to prevent—the decline and possible extinction of the three species.

On June 29, 2010, Exotic Wildlife filed with the Secretary of the Department of Interior ("Secretary") a petition to remove the domestic, captive populations of the three antelope species from the endangered species list on the ground that these species were no longer—if they ever were—on the brink of extinction in the United States.  In addition, these three species are not endangered in Texas, where large, captive-bred populations of the three antelope species are thriving and, because of the restrictions placed on Wildlife members the result will be precisely what the ESA was enacted to prevent—the decline and possible extinction of the three species. (A copy of this petition was attached to Plaintiffs Complaint, and is attached hereto as Exhibit A).

Despite the mandatory requirement that the Secretary do so within 90 days after receiving the petition, the Secretary has to date failed and refused to decide whether Exotic Wildlife petition to delist the three species presents "substantial scientific or commercial information indicating that the petitioned action may be warranted,"[15]  nor has he "promptly commence[d] a review of the status of the species concerned."[16]

Since June 29, 2010, the Secretary has been in possession of Exotic Wildlife's petition to delist these species.  Despite the mandatory statutory requirement that he do so within twelve months after receiving the petition, the Secretary has failed and refused to determine that either (1) the petitioned action is warranted; (2) the petitioned action is not warranted; or (3) the

---

[15] 16 U.S.C. § 1533(b)(3)(A).
[16] *Id.*

petitioned action is warranted but immediate promulgation of a rule is precluded by other pending proposals.[17]

On June 30, 2011, Exotic Wildlife served on the Secretary a written notice of intent to sue, in compliance with the ESA notice requirements.  But the Secretary again failed to respond to that notice in any way.  (A copy of Plaintiffs' notice of intent to sue is attached as Exhibit B.)

On October 17, 2011, Exotic Wildlife filed a complaint in this Court for the Secretary's failure to act on his non-discretionary duties under 16 U.S.C. §1533(b)(3)(A) and 16 U.S.C. § 1533(b)(3)(B).[18]  Additionally, Exotic Wildlife filed a claim under the Administrative Procedure Act ("APA") for the Secretary having unlawfully and unreasonably delayed agency action by failing to make both a 90-day finding, and a 12-month finding.[19]

## ARGUMENT

## I.   PLAINTIFFS PROVIDED SUFFICIENT NOTICE UNDER THE ENDANGERED SPECIES ACT

The ESA authorizes citizen suits "against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section [1533 of this title] which is not discretionary with the Secretary."[20]  But such a lawsuit cannot be filed "prior to sixty days after written notice has been given to the Secretary . . . ."[21]  That notice is likely mandatory, but not jurisdictional.[22]  Although the timing requirement is strict, "the content requirement for notice letters are not to be construed as strictly as the timing requirements."[23]

---

[17] 16 U.S.C. § 1533(b)(3)(B).
[18] *See* Exotic Wildlife Complaint 14-16 (Attached hereto as Exhibit C).
[19] *See* Exhibit C at 16.
[20] 16 U.S.C. § 1540(g)(1)(C).
[21] 16 U.S.C. § 1540(g)(2)(C).  The sixty-day waiting period does not apply where there is an emergency posing a significant risk to the well-being of species.
[22] *See Lockett v. EPA*, 319 F.3d 678, 682 (5th Cir. 2003) (holding the similar requirement in the Clean Water Act, "although mandatory, is not jurisdictional in the strict sense of the term . . . .") (*quoting Sierra Club v. Yeutter*, 926 F.2d 429, 437 (5th Cir. 1991)).  *Yeutter* did not, however, directly hold that failure to

### A.     Legal Standards for Notice

Courts—including the Northern District of Texas—routinely apply an interchangeable standard when examining the notice requirements of the ESA, Clean Water Act, and Resource Conservation and Recovery Act.[24]   The standard is also informed by regulations defining notice requirements.[25]   Those regulations all require enough information to identify the violation and the parties involved.[26]   There is no ESA notice regulation that applies to private parties, but the regulation governing notices sent out by FWS requires only the facts, the law, and the fine:

> The notice shall contain: (1) A concise statement of the facts believed to show a violation, (2) a specific reference to the provisions of the statute or regulation allegedly violated, and (3) the amount of penalty proposed to be assessed.[27]

Likewise, the virtually identical RCRA and CWA regulations require only the facts, the law, the date of the violation, as well as some information about the person sending the notice of intent, with RCRA requiring:

> Notice regarding an alleged violation of a permit, standard, regulation, condition, requirement, or order which has become effective under this Act shall include sufficient information to permit the recipient to identify the specific permit, standard, regulation, condition, requirement, or order which has allegedly been violated, the activity alleged to constitute a violation, the person or persons

---

comply with the 60-day requirement of the ESA would require a suit to be dismissed (and there is no Fifth Circuit case so holding); rather, *Yeutter* held that because the requirement was not jurisdictional, an argument that a party failed to comply with the statute could not be raised for the first time on appeal.  *See Yeutter*, 926 F.2d at 437 n.10.

[23] *In re:  Voluntary Purchasing Grps., Inc. Litigation*, 2002 U.S. Dist. LEXIS 19819 at *9 (N.D. Tex. Oct. 16, 2002) (*citing Atl. States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 820 (8th 1997) and *Pub. Interest Research Grp. of N.J., Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1246 (3d Cir. 1995)).  *See also United States v. Idaho*, 508 U.S. 1, 7, (1993) .

[24] *See In re:  Voluntary Purchasing Grps.*, 2002 U.S. Dist. LEXIS 19819 at *9 n.2 (Supreme Court precedent "authorizes this interchangeable analysis of notice provisions"); *Brod v. Omya, Inc.*, 653 F.3d 156, 167–68 (2d Cir. 2011); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 399  (4th Cir. 2011); *Water Keeper Alliance v. U.S. Dept. of Defense*, 271 F.3d 21, 29 (1st Cir. 2001); *Washington Trout v. McCain Foods, Inc.*, 45 F.3d 1351, 1353 (9th Cir. 1995); *accord Hallstrom v. Tillamook Cty.*, 493 U.S. 20 (1989).

[25] 40 C.F.R. §§ 135.3(a) (CWA), 254.3(a) (RCRA); 50 C.F.R. § 11.11(a) (ESA).

[26] *Id.*

[27] 50 C.F.R. § 11.11(a).

responsible for the alleged violation, the date or dates of the violation, and the full name, address, and telephone number of the person giving notice.[28]

The CWA requires sufficient information to identify the law, the type of activity causing the violation, and the date of the violation:

> Notice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.[29]

In sum, all of these regulations require only a statement of the type and facts of the alleged violation. Although there is no regulatory definition of the notice requirement sent by a private citizen or citizens' group, courts only require enough information for person or agency receiving the letter to be able to identify the conduct that was the complained-of violation.

*In re: Voluntary Purchasing Groups, Inc. Litigation*,[30] a Northern District of Texas case, held that so long as a notice of intent to sue includes "'sufficient information *to permit the recipient to identify* the components of an alleged violation,'" the notice is sufficient.[31] In that case, the plaintiffs sued a mining company under RCRA. The letter stated that the plaintiffs intended to sue under the Solid Waste Disposal Act and RCRA, without identifying any particular section of RCRA. The letter also gave a "brief summary of the violations alleged."[32] The mining company argued that this was insufficient notice. The court disagreed, holding that "although the Plaintiffs' letter could have been more clear as to the specific section of RCRA it

---

[28] 40 C.F.R. § 254.3(a).
[29] *Id.* at § 135.3(a).
[30] 2002 U.S. Dist. LEXIS 19819.
[31] *Id.* at *9 (*quoting Pub. Interest Research Grp. of N.J., Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1247–48 (3d Cir. 1995)) (*emphasis added*).
[32] *Id.* at *10.

claims was violated,"[33] the mining company had been given sufficient information to be notified

of the lawsuit because it stated what law was broken and gave the conduct that broke the law.

In accord with the standard requiring only that the agency being noticed be able to

identify the complained-of violation, the First Circuit, in *Water Keeper Alliance v. United States*

*Department of Defense*,[34] also rejected an argument similar to the Government's in this case.

There, several environmental groups sued the Department of Defense for failure to prepare a

biological assessment and opinion for military exercises on and around Vieques Island.[35]   The

groups sent a notice letter to the Navy complaining that the Navy had been conducting exercises

on the island without a biological assessment incorporating new scientific evidence.[36]   Although

a biological opinion was eventually issued, it did not apply to then-ongoing exercises, and the

groups sued over those exercises.[37]   During the relevant time period, the Government had entered

into consultation in lieu of a biological assessment.   The First Circuit held that although the letter

did not complain of the decision to use a consultation package instead of a biological assessment,

the Navy was nonetheless on notice of the claims the groups had against it:   "To say that the

Navy was not on notice that Water Keeper would object to the failure to prepare a biological

assessment for its interim activities, when the Notice makes it clear that Water Keeper intended

to challenge an ongoing delinquency in the preparation of a biological assessment, would be

setting the bar for adequacy of notice too high."[38]

This is in line with the requirements of the citizen-suit provisions of the other

environmental statutes, which only require sufficient information to put the defendant on notice

---

[33] *Id.*
[34] 271 F.3d 21.
[35] *Id.* at 24.
[36] *Id.* at 30.
[37] *Id.*
[38] *Id.*

of the nature of the claim:  "the citizen is not required to list every specific aspect or detail of every alleged violation.  Nor is the citizen required to describe every ramification of a violation."[39]  As several circuits have recognized, the purpose of the notice requirement is met when the notice gives "the appropriate governmental agencies an opportunity to act . . . ."[40]

### B.    Exotic Wildlife Provided Clear Notice

Exotic Wildlife's notice of intent satisfied the notice requirement of the ESA.  First, the notice of intent expressly mentioned both the statutory provision that required FWS to act on that petition—16 U.S.C. § 1533(b)(3)—and FWS's failure to act on the petition to delist.[41]  Although the opening paragraph does not discuss the petition to delist, page 13 of the letter informs FWS that the Exotic Wildlife Association is asking FWS to delist the antelope:

> EWA seeks the delisting of the U.S. captive-bred populations of scimitar-horned oryx (*Oryx dammah*), dama gazelle (*Gazelle dama*), and addax (*Addax nasomaculatus*) under the authority of 16 U.S.C. § 1533(b)(3)(A), 5 U.S.C. § 553(e), and 50 C.F.R. § 424.11(d)(3) because FWS's interpretation of the original data for the listing was in error and because the U.S. captive-bred populations of the three antelope are recovered.

So, the notice of intent names the specific statute on which the complaint is based with much more precision than the general reference to RCRA in *In re:  Voluntary Purchasing*.  The notice of intent also invokes FWS's authority to delist the antelope throughout the letter.

The notice of intent also later expressly mentioned FWS's failure to act on the petition to delist on page 22 of the letter:  "FWS failed to reverse its listing decision once Judge Kennedy ruled in *Friends of Animals v. Salazar* against the legality of the special exemption applicable to these U.S. captive-bred herds and further failed to act on EWA's delisting petition."[42]

---

[39] *Pub. Interest Research Grp.*, 50 F.3d at 1248.

[40] *Brod*, 653 F.3d at 166; *accord Gaston Copper*, 629 F.3d at 399; *Washington Trout*, 45 F.3d at 1354.

[41] *See* Exhibit B at 13.

[42] Exhibit B at 22.

Second, the notice of intent informed FWS of the conduct that violated the law.  Under

Section 4 of the ESA, FWS was required to make an initial finding, then a final finding either

denying the petition or beginning review of the listing regulation.[43]  But by the time the statutory

deadline had passed, FWS had not acted on the petition.  That conduct was the basis of the

notice of intent.  For instance, on page 6, the letter states "FWS should invoke its authority

under 50 C.F.R. § 424.11(d) to delist the U.S. captive-bred populations of the three antelope

species," and pages 12 through 21 explain why FWS should delist the antelope.  This

explanation would not be needed but for FWS's conduct—inaction on the petition to delist.

Like the plaintiffs in *Water Keeper*, Exotic Wildlife had informed the Government of the

conduct that was the basis of its complaint, even if the letter had not expressly mentioned the

petition.  So the notice of intent described the conduct that formed the basis of this lawsuit —

FWS's continued refusal to delist the antelope as requested in the petition.

Finally, the notice of intent gave information analogous to the information required for a

notice of intent issued by Interior.  The letter gave a statement of the facts that show there was a

violation (the failure to act directly on the petition and the failure to delist the antelope).  The

letter also specifically referenced the statute that had been violated (16 U.S.C. § 1533(b)(3)).

And although a statement of the relevant fine is not applicable in this case, the demand that FWS

delist the antelope serves the same purpose by notifying the potential defendant of the

consequences of the violation.

The Government has stated that "the second violation alleged in Plaintiffs' letter

suggests that Plaintiffs intend to sue the Service for failing to exercise its inherent authority to

change the listing status of the species, not that Plaintiffs intend to sue for failure to make a 90-

---

[43] 16 U.S.C. § 1533(b)(3).

day finding on their petition."[44]   The Government's assertion is without basis.   On the same page

the Government is referencing, page 13 of the notice of intent, Plaintiffs state "EWA seeks the

delisting of the U.S. captive-bred populations of [the three antelope species] under the authority

of 16 U.S.C. § 1533 (b)(3)(A) . . ."[45] ."   That statutory section  reads:

> To the maximum extent practicable, within 90 days after receiving the petition of
> an interested person under section 553(e) of title 5, United States Code 5 USCS .
> §553(e), to add a species to, or to remove a species from, either of the lists
> published under subsection (c), the Secretary shall make a finding as to whether
> the petition presents substantial scientific or commercial information indicating
> that the petitioned action may be warranted. If such a petition is found to present
> such information, the Secretary shall promptly commence a review of the status
> of the species concerned. The Secretary shall promptly publish each finding made
> under this subparagraph in the Federal Register.

The Notice Letter plainly asked the Secretary to act on his statutory duty, not his inherent

authority, which requires him to act on a petition within 90 days.   Because the notice of intent

informed FWS that by failing to act on the petition directly, or delist the three antelope species,

FWS was in violation of 16 U.S.C. § 1533, the notice was sufficient.

## C.      The Government's Cases are Inapplicable

The Government cites a number of cases in its brief that simply have no applicability to

the facts at issue in this case.   In *Hallstrom v. Tillamook County*,[46] the notice was found to be

deficient because the plaintiffs failed to provide any notice to the state or the Environmental

Protection Agency, as required by statute.   As there is no contention that the FWS did not receive

notice in this case, the holding in *Hallstrom* has no relevance.   Likewise, the Government cites

*Sierra Club v. Yeutter*, a case that was not decided on notice issues and did not even address

---

[44] U.S. Motion to Dismiss or Transfer at 10.
[45] *Id.*
[46] 493 U.S. 20, 29 (1989).

notice except to the extent of holding that notice issues that are not challenged at the district court cannot be challenged on appeal.[47]

Even the two ESA cases the Government cites to, *Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation*,[48] and *Lone Rock Timber Company v. United States Department of Interior*,[49] miss the mark by a wide margin.  In *Southwest Center*,[50] despite sending a series of notice letters, plaintiffs and intervenors fail to identify the species at issue or even the geographical location of the activities of concern.  Again, that case bears no application to the clear, specific notice that was provided in this case— giving notice of the species of concern, the action complained of, notifying the correct parties, and the appropriate action to be taken to correct the complained of violation.  Here, Exotic Wildlife provided clear notice to the Government and there is no basis to dismiss for lack of notice.  Likewise, the *Lone Rock Timber Company,*[51] case is inapplicable.  In that case, the plaintiffs failed to provide any notice in their action, instead relying on notice they had provided in an earlier lawsuit.  Again, that bears no relation to the facts at hand and the clear, specific notice that Exotic Wildlife provide to the FWS articulating the nature of the violation, the statue being violated, and Exotic Wildlife's intention to sue if the violation was not corrected within sixty days.

### D.    Exotic Wildlife Properly Brought Both ESA and APA Claims

Exotic Wildlife has brought two separate and distinct causes of action—one under the Endangered Species Act, one under the Administrative Procedure Act.   As the Supreme Court has held, "judicial review of final agency action by an aggrieved person will not be cut off unless there is a persuasive reason to believe that such specifically was the purpose of

---

[47] 926 F.2d 429 (5th Cir. 1991).
[48] 143 F.3d 515 (9th Cir. 1998).
[49] 842 F. Supp. 433 (D. Or. 1994).
[50] 143 F.3d 515, 520-521 (9th Cir. 1998).
[51] 842 F. Supp. 433 (D. Or. 1994).

Congress."[52]   Contrary to the Government's assertion, endangered species cases may be adjudicated under the APA in the Fifth Circuit.

In *Sierra Club v. Glickman*,[53] the Fifth Circuit held that a challenge to agency inaction under the citizen suit provision of the ESA may alternatively be brought under the APA.   There, the Sierra Club challenged Department of Agriculture's failure to consult with FWS while managing the Edwards Aquifer.   The Government, citing *Bennet v. Spear*,[54] argued that the citizen-suit provision cannot be relied on to challenge the Government's failure to follow the affirmative requirements of the ESA (in that case, ESA's requirement of interagency cooperation).   The court rejected this argument.   The court also held that, alternatively, if the suit could not have been brought under the ESA it could have been brought under the APA:

> Under the APA, any person "adversely affected or aggrieved by agency action," 5 U.S.C. § 702, may petition a court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or to "compel agency action unlawfully withheld." 5 U.S.C. § 706. In this case, the USDA does not dispute that Sierra Club is a person adversely affected or aggrieved within the meaning of § 7(a)(1).[55]

Likewise in *Biodiversity Legal Foundation v. Norton*,[56] appellants brought claims under both the APA and the ESA's citizen suit provision.   Persuaded by the Tenth Circuit's ruling in *Forest Guardians v. Babbitt*,[57] the district court implicitly held that the grant of injunctive relief was authorized under the judicial review sections of the APA.   The district court adopted the following *Forest Guardians* holdings: "(1) when the Secretary fails to comply with a statutorily imposed absolute deadline, it has unlawfully withheld agency action"; and (2) the APA "requires

---

[52] *Abbot Laboratories v. Gardner*, 387 U.S. 136, 140 (1967).
[53] 156 F.3d 606, 616–17 (5th Cir. 1998).
[54] 520 U.S. 154 (1997).
[55] *Id.* at 617.
[56] 284 F.3d 1046.
[57] 174 F.3d 1178, 1187 (10th Cir. 1999).

the court to issue an injunction when the Secretary misses deadlines under the ESA."[58]  The

district court then issued an injunction requiring the Service to make the requested final

determinations.[59]

The APA provides the judicial standard of review in this case.[60]  "Under the APA, a court

may set aside an agency action if the court determines that action was arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law or without observance of procedure

required by law."[61]  This Court has the right and authority to find that the agency's action

violated *both* the ESA and the APA, and to issue separate remedies under each.

## II.    THE CASE SHOULD REMAIN IN THE NORTHERN DISTRICT OF TEXAS

### A.    Venue is Appropriate in this Court

Plaintiffs filed suit in the Northern District of Texas as it is the proper venue for this

action under 28 U.S.C. § 1391(e)(3) because Exotic Wildlife reside in this judicial district.

Additionally, "a substantial part of the events or omissions giving rise to the claim occurred" in

this judicial district,[62] as the captive populations of the three African antelope species at issue in

this case are all being raised by Exotic Wildlife within this judicial district.

In applying 28 U.S.C. §1404(a), a district court must determine "whether the judicial

district to which transfer is sought would have been a district in which the claim could have been

filed."[63]  Plaintiffs do not dispute that their claim could have been brought in the District of

Columbia, as the federal defendant resides there,[64] only that venue is more proper in the

---

[58] *See id. at 1191.*

[59] *See id.*

[60] *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.,* 255 F.3d 1073, 1078, n.14 (9th Cir. 2001).

[61] *Id.* (citations and internal quotation marks omitted).

[62] 28 U.S.C. § 1391(e)(2).

[63] *In re Volkswagen AG,* 371 F.3d 201, 203 (5th Cir. 2004) (citing *In re Horseshoe Entm't,* 337 F.3d 429, 432 (5th Cir.), cert. denied, 540 U.S. 1049, 124 S. Ct. 826, 157 L. Ed. 2d 698 (2003)).

[64] *See* 28 U.S.C. § 1391(e)(1).

Northern District of Texas as the Plaintiffs reside here, the subject animals live and breed here, the effects of the regulations will be felt most significantly here, and not at all in the District of Columbia – where there are no ranches and none of the endangered antelope species. Accordingly, this Court is best prepared to deal with these local issues.

### B.    The Government Has Failed to Sustain Its Burden to Establish that this Case Should be Transferred

#### 1.    Standard for Motions to Transfer

Even if venue is proper, the court may transfer the case to another district if the requirements of 28 U.S.C. §1404(a) are met. Transfer of venue pursuant to 28 U.S.C. § 1404(a) is at the discretion of the court, considering '"[a]ll relevant factors to determine whether or not on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum.'"[65]

The moving party must meet a standard of "good cause" to overcome the importance given to the plaintiff's choice of venue.[66]  "[W]hen the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected."[67] The determination of "convenience" under section 1404(a) turns on a number of private and public interest factors, none of which is given dispositive weight.[68]  The private interest factors include:

> (1) the relative ease of access to sources of proof; (2) the availability ofcompulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive.[69]

---

[65] *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1436 (5th Cir. 1989) (*quoting* 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3847 at 370 (1986)); *see also Stewart Org. Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).

[66] *See In Re: Volkswagen*, 545 F.3d 304, 315 (5th Cir. 2008).

[67] 545 F.3d at 315.

[68] 545 F.3d at 315.

[69] *Id.* (citations omitted).

The public interest factors include:

> (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law.[70]

The moving party bears the burden of establishing that these factors support transferring the case to another forum.[71] In this case, the Government has not met its burden.

### C. Private Interest Considerations Require Adjudication in the Northern District of Texas

#### 1. Relative Ease of Access to Sources of Proof

The "accessibility and location of sources of proof should only weigh slightly in a Court's transfer analysis since these factors have been given decreasing emphasis due to advances in copying technology and information storage."[72] Yet to the extent that this remains a factor for consideration, it weighs against transfer in this case. The Government has already stated that it intends to base its case on the administrative record —something that is routinely made available through electronic files. The same cannot be said for potential sources of proof for Exotic Wildlife that may be tied to their ownership and management of the three antelope species at issue and in residence in this judicial district. Indeed, Dr. Elizabeth Mungood, who studies and records the numbers of these endangered animals for Exotic Wildlife, resides in Texas.

---

[70] *Id.*

[71] *Time, Inc. v. Manning*, 366 F.2d 690, 698 (5th Cir. 1966); *Carlile v. Continental Airlines, Inc.*, 953 F. Supp. 169, 170 (S.D. Tex. 1997); *Acumen Enters. v. Morgan*, 2011 U.S. Dist. LEXIS * 132044 (N.D. Tex. Nov. 15, 2011).

[72] *Mohamed v. Mazda Motor Corp.*, 90 F.Supp. 2d 757, 778 (E.D. Tex. 2000).

### 2.   Availability of Compulsory Process to Secure Witnesses' Attendance

The Government has indicated that its witnesses would be government "personnel,"[73] and thus would be within the subpoena power of this Court, regardless of their location.  Exotic Wildlife's witnesses, however, all reside within this judicial district.  Forcing these witnesses to travel to the District of Columbia for hearings or interviews would be unduly burdensome and costly, and would also present a burden for the Court if the case were transferred.  Since these witnesses, however, all reside within this judicial district, there would be no similar burden if the case were not transferred.  This factor weighs against transfer.

### 3.   Willing Witnesses' Cost of Attendance

The Government argues that this case can be decided without "discovery, depositions, witness testimony or trial," and thus, "there will be little or no need to travel to Washington, DC."[74]  Plaintiffs disagree.  Even if this case were to be decided on the administrative record, Plaintiffs would still wish to bear witness to the decisions that permanently affect their rights, welfare, and future, and thus, if this case were transferred, would be required to travel to Washington, DC in order to do so.  This is an undue financial burden.  Furthermore, if the Government's assertion is incorrect and this case were to involve more substantial discovery, hearings, and trial, the financial burden placed upon Plaintiffs alone to participate in these legal proceedings would be manifestly unjust.  This factor weighs strongly against transfer.

### 4.   All Other Problems that Make Case's Trial Easy, Expeditious and Inexpensive

This factor is neutral and thus does not support transfer.

---

[73] Def.'s Mot. Dismiss or Transfer at 18.
[74] Def.'s Mot. Dismiss or Transfer at 18.

### D.  Public Concerns

#### 1.   Administrative Difficulties Flowing From Court Congestion

The District of Columbia had 4,034 cases pending as of July 2011.[75]  There are fifteen judges in this court and an approximate case load of 269 cases per judge.  Cases proceed slowly, with an approximate 38.2 months from filing until trial for civil cases. Additionally, there are 476 cases pending that are more than three years old.

The Northern District of Texas had 4,394 cases pending as of July 2011.[76]  There are twelve judges, with an approximate case load of 366 cases pending per judge.  Despite the higher numbers, cases are moving more quickly in the Northern District court with a time frame of 19.2 months from filing to trial, half the 38.2 months in would take in the District of Columbia.  Additionally, there are only 61 civil cases pending that are over three years old, as opposed to more than 476 cases in the District of Columbia.

Although the Northern District of Texas has a slightly greater case load and fewer judges, the judicial efficiency and speed with which this District moves through cases makes this factor argues against transfer.  The thirty-eight month time frame for the District of Columbia to move from filing all the way to trial of this case, if it were transferred, could be the final years of the species.  The populations of the species have started to decline since FWS first announced that it would be imposing more onerous regulations on the ranchers.  In three years time, these captive populations may be gone.  This factor weighs against transfer.

---

[75] Federal Court Management Statistics, June 2011, at www.uscourts.gov/statistics/federalcourtmanagement
[76] Federal Court Management Statistics, June 2011, at www.uscourts.gov/statistics/federalcourtmanagement

### 2.    Local Interest in Having Local Issues Decided at Home

Courts have observed that environmental cases often provide a particularly strong basis

for finding a localized interest in the region touched by the challenged action.[77]  ESA cases are

often transferred *to* the court with the local interest in the issue to adjudicate the matter, and

away from the District of Columbia.   For example, in *National Wildlife Federation v. Harvey*,

the court transferred an ESA case to the district where the affected species, land and

communities were— in South Florida—away from the District of Columbia.[78]   There, the court

found localized interest and impacts in the disputed actions of the Army Corps of Engineers:

> The disputed actions of the Corps have a direct and substantial impact on the
> residents and wildlife of Southern Florida. Lake Okeechobee and the snail kite
> population are located in Southern Florida, and "[t]he Lake Okeechobee schedule
> affects the St. Lucie and Caloosahatchee River estuaries where the lake discharges
> to tide to the East and West, urban drinking water supply, irrigation for
> agricultural canals, recharge of wellfields, habitat within and surrounding the
> lake, sportfishing and commercial fisheries, tourism, wading bird breeding and
> foraging, resident and migratory waterfowl, and endangered species as well as
> water available to the Everglades . . . ."[79]

In *Trout Unlimited v. United States Dept. of Agriculture*,[80] the court transferred the case

from the District of Columbia because the decision-making process occurred in Colorado, and

the case involved issues of Colorado water and property law best decided by a local court:

> In *Trout Unlimited,* plaintiffs objected to the Forest Service's decision granting a
> private company an easement to operate the Long Draw Reservoir, a water supply
> for the people of Colorado. The decisions at issue in *Trout Unlimited* were made
> entirely by Forest Service personnel in Colorado, and the dispute included

---

[77]See, e.g., *Ctr. for Biological Diversity & Pac. Env't. v. Kempthorne*, 2007 U.S. Dist LEXIS 53187 at
*22 (transferring case to District of Alaska because "none of the operative facts occurred within this
district and the challenged [FWS] decision . . . [approving] industrial oil and gas exploration,
development, and production activities in Alaska is one in which Alaska and its residents have a great
interest"); *Hawksbill Sea Turtle v. FEMA*, 939 F. Supp. 1, 3 n.5 (D.D.C. 1996) (transferring ESA case to
District Court of the Virgin Islands where relevant species' habitats were located in the Virgin Islands and
challenged agency actions took place there).
[78] 437 F. Supp. 2d 42, 47 (D.D.C. 2006).
[79] *Id.* at 47 (citations omitted).
[80] 944 F. Supp. 13, 18 (D.D.C. 1996).

possible state law claims which a federal court in Colorado would be better able to adjudicate. There was no argument that the disputed easement decision was of national significance or involved a national resource.[81]

Likewise here, the parties affected by the listing or de-listing of these three African antelope species are these Texas ranchers— the Plaintiffs in this case—as well as the herds of captive-bred antelopes they breed, manage and protect in the Northern District of Texas.  The vast majority of the expertise, interest and parties to this decision are located in this judicial district and the effects of this decision will be felt most significantly and dramatically within the confines of this local district.  The policy rationale applies for having local issues decided at home applies equally to the judicial review of an administrative decision which will be limited to the administrative record.[82]  This is a local interest and a local issue and should be decided at home, in the Northern District of Texas.

### 3.   Forum's Familiarity with the Governing Law

The governing law is federal law and will not change if the case were to be transferred.  Exotic Wildlife believe that both the Northern District of Texas and the District of Columbia are equally capable and familiar with applicable federal laws.  Thus, this factor is neutral and does not support transfer.

### 4.   Avoidance of Unnecessary Conflict of Law Problems

There will be no conflict of laws issues, since the governing law will not change regardless of the venue.  Thus, this factor is neutral and does not support transfer.

### E.  The Government's "Judicial Economy" Argument Does Not Support Transfer

FWS largely side-steps the private and public interest factors used by this Court to evaluate whether the moving party has shown good cause for transfer, focusing almost solely on

---

[81] *The Wilderness Society v. Babbitt*, 104 F. Supp. 2d 10, 17 (D.D.C 2000).
[82] *See Town of Ledyard v. United States*, 1995 U.S. Dist. LEXIS 21477; *see also Trout Unlimited v. United States Dep't of Agric.*, 944 F. Supp. 13, 22 (D.D.C 1996).

an argument that transfer would serve the interests of justice and judicial economy.[83]  The

Government bases this argument on the fact that a case involving similar claims was filed in the

District of Columbia one day prior to this case.  And, indeed such a case was filed one day prior

to this case, challenging the Secretary's failure to de-list the three antelope species.[84]

Assuming arguendo that the Government is correct and that the interests of justice and

judicial economy would be served by trying these cases together, that would merely argue for

consolidation, not transfer.  As discussed at length in relation to the relevant private and public

interest factors, the Northern District of Texas is the local district, with the localized interest in

this case, where the plaintiffs reside, the majority of the witnesses reside, the regulated species

live and breed, and the actions at issue would have the most significant impacts.  If these cases

were ever to be consolidated and tried together, the Northern District of Texas would be the

appropriate venue for both cases.

While the Government seems to make much of the idea that the Safari Club International

case was filed before this case,  it is worth noting that the case was filed prior to this case by

merely one day.  Additionally, no substantive activity has taken place in the case as of yet, quite

unlike the single case that the Government is able to cite to support its argument in favor of

transfer where a "well advanced" case that had been "pending for approximately two years" and

where "substantial discovery" had already taken place.[85]

The Fifth Circuit follows a so-called "first-to-file" rule, but that rule is not applicable in

this case.  Under that rule, "when related cases are pending before two federal courts, the court in

which the case was last filed may refuse to hear it if the issues raised by the cases substantially

---

[83] *See* Def.'s Mot. Dismiss or Transfer at 17-18.
[84] *Safari Club Int'l v. Salazar, et al.*, Civ. No. 1:11-cv-01564-BAH (D.D.C Filed Aug. 31, 2011)
[85] *Biochem Pharma, Inc. v. Emory Univ.*, 148 F. Supp. 2d 11, 13-14 (D.D.C.  2001).

23

overlap."[86]  For this rule to apply, there must be "substantial overlap" of both the issues and the parties involved.[87]

Here, while there are similar issues raised in the case filed in the District of Columbia, there is no overlap of parties.  Exotic Wildlife is not involved in the case filed in the District of Columbia—and their interests are not represented in that action.  While the United States is the defendant in both cases, the Plaintiffs in the two actions have no overlap.  Thus, the first-to-file rule does not apply.

**CONCLUSION**

Exotic Wildlife provided proper, sufficient and complete notice in this case, informing FWS of Exotic Widlife's intention to file suit if FWS failed to act on Exotic Wildlife's petition to delist the three captive-bred populations of African antelope species that Exotic Wildlife are raising in Texas.  As this case involves significant local issues and interests, witnesses and Plaintiffs in Texas, the balance of both the private and public interests weigh against transfer 28 U.S.C. § 1404(a), and this case should remain in the local, proper venue of the Northern District of Texas.

---

[86] *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999).
[87] *See Save Power Ltd. V. Syntek Finance Corp.*, 121 F.3d 947, 950-951 (5th Cir. 1997).

Respectfully submitted,

  s/ Roger J. Marzulla
Roger J. Marzulla
Nancie G. Marzulla
Marzulla Law, LLC
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)

Dated:  January 17, 2012                Counsel for Exotic Wildlife Association